# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

THERESA M. SADLER,

        Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

        Defendant.

No. C12-2092

RULING ON JUDICIAL REVIEW

---

## TABLE OF CONTENTS

*I.*    *INTRODUCTION* ....................................... 2

*II.*   *PROCEDURAL BACKGROUND* ............................ 2

*III.*  *PRINCIPLES OF REVIEW* ................................ 3

*IV.*  *FACTS* ................................................ 5
    *A.*   *Sadler's Education and Employment Background* ............. 5
    *B.*   *Administrative Hearing Testimony* ....................... 5
        *1.*   *Sadler's Testimony* ......................... 5
        *2.*   *Vocational Expert's Testimony* ................... 8
    *C.*   *Sadler's Medical History* ............................. 9

*V.*   *CONCLUSIONS OF LAW* ................................ 14
    *A.*   *ALJ's Disability Determination* ...................... 14
    *B.*   *Objections Raised By Claimant* ....................... 17
        *1.*   *Dr. Harding's Opinions* ..................... 17

---

[1] Plaintiff originally filed this case against Michael J. Astrue, the Commissioner of Social Security Administration ("SSA"). On February 14, 2013, Carolyn W. Colvin became Commissioner of the SSA. The Court, therefore, substitutes Commissioner Colvin as the Defendant in this action. FED. R. CIV. P. 25(d)(1).

      2.    *Dr. Scott's Opinions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      3.    *RFC Assessment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      4.    *Credibility Determination* . . . . . . . . . . . . . . . . . . . . . . . . . 23

*VI.*  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*VII.*  *ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## *I. INTRODUCTION*

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Theresa M. Sadler on December 26, 2012, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Sadler asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Sadler requests the Court to remand this matter for further proceedings.

## *II. PROCEDURAL BACKGROUND*

On April 30, 2010, Sadler applied for both disability insurance benefits and SSI benefits. In her applications, Sadler alleged an inability to work since July 1, 2004 due to post-traumatic stress disorder ("PTSD"), depressive disorder, dissociative disorder, conversion disorder, psychogenic seizures, physical abuse as a child and adult, history of alcohol and methamphetamine abuse, and history of addictive personality.[2] Sadler's applications were denied on June 7, 2010. On October 8, 2010, her applications were denied on reconsideration. On November 1, 2010, Sadler requested an administrative hearing before an Administrative Law Judge ("ALJ"). On January 11, 2012, Sadler

---

[2] At the administrative hearing, Sadler's attorney amended Sadler's disability onset date to April 16, 2008. *See* Administrative Record at 32; *see also* Administrative Record at 10 (ALJ's decision using amended disability onset date). In their briefs, both parties also agree that Sadler's disability onset date is April 16, 2008. *See* Sadler's Brief (docket number 11) at 1; Commissioner's Brief (docket number 14) at 2-3.

appeared via video conference with her attorney before ALJ Eric S. Basse for an administrative hearing. Sadler and vocational expert Vanessa May testified at the hearing. In a decision dated March 12, 2012, the ALJ denied Sadler's claims. The ALJ determined that Sadler was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Sadler appealed the ALJ's decision. On November 19, 2012, the Appeals Council denied Sadler's request for review. Consequently, the ALJ's March 12, 2012 decision was adopted as the Commissioner's final decision.

On December 26, 2012, Sadler filed this action for judicial review. The Commissioner filed an Answer on March 19, 2013. On April 20, 2013, Sadler filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing work that exists in significant numbers in the national economy. On July 1, 2013, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On July 11, 2013, Sadler filed a reply brief. On January 29, 2013, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing."

42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's

decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Sadler's Education and Employment Background

Sadler was born in 1974. She is a high school graduate. At the administrative hearing, Sadler told the ALJ that she also attended the University of Iowa for one year, and spent 1.5 years attending the American Institute of Commerce. She stated that she earned certificates in hotel/restaurant management and business management.

The record contains a detailed earnings report for Sadler. The report covers the time period of 1992 to 2011. According to the report, from 1992 to 2004, Sadler earned between $817.88 (1992) and $16,176.00 (2002). She has no earnings since 2005.

### B. Administrative Hearing Testimony

#### 1. Sadler's Testimony

At the administrative hearing, the ALJ questioned Sadler about her functional abilities:

> Q:    When you go out for these walks around town, how long are you able to walk?

A:     Before my legs start hurting, I can walk for maybe ten
       minutes, but I push myself to go longer because I know
       within ten minutes it's -- the exercise is not doing that
       well of a job. It has to go longer for it to burn more
       calories. So I push myself longer, but I can -- about the
       ten-minute mark is when my legs start hurting.

Q:     When you stop walking, about how long are you able to
       go before you have to stop?

A:     Before I stop is probably about 20 minutes, and that's
       when I have to take a break.

Q:     What do you do when you take a break?

A:     I have a certain path that I walk around town. So at the
       20-minute mark, it's usually -- there's a bench where I
       sit for about 15 minutes, and then I'll get up and go
       back to my apartment. And that's about the walk.

Q:     Okay. So you're able to walk you say for 10 to 20
       minutes, then take a rest, then you walk for another
       10 or 20 minutes?

A:     Right.

Q:     How long can you sit at any one time?

A:     To sit? I -- without shifting positions is probably about
       15, 20 minutes. My legs go numb. . . .

Q:     Can you sit for say example a couple hours at a time?
       If you shift positions like you say, sit for a couple hours
       and then get up and take a break?

A:     No, I can't. Not -- I'm not a sitter. I mean I bounce
       around a lot.

Q:     How long can you sit before you have to stand up say
       for example?

A:     A half hour maybe. 20 minutes, half hour.

(Administrative Record at 37-38.)

The ALJ also asked Sadler to discuss her difficulties with seizures. Sadler
explained that she has approximately two or three seizures per month. She stated that the
seizures last about 5 to 7 minutes. According to Sadler, after coming out of a seizure, "I
usually am stuttering. I'm not able to communicate the way I want to. My head is really

foggy.  I'm -- my head hurts a lot.  It's on a very high level of pain after a seizure[.]"[3]
Sadler stated that after a seizure, she has difficulty with concentration and it can last anywhere from 10 minutes to 2 hours.

Sadler's attorney also questioned Sadler at the hearing.  Sadler's attorney inquired about Sadler's difficulties with depression and interacting with people.  Sadler indicated that she has dealt with depression for over five years and does not like to leave her apartment because she is "afraid" of people.  Specifically, Sadler testified that "I'm just generally afraid.  I was abuse[d] for a long time, and he just has stuck it in my mind that nobody would want me and nobody would want to have anything to do with me.  You know and I just feel safest in my home you know where no one can judge me."[4]

Sadler's attorney also questioned Sadler about her functional abilities:

Q:    How much do you think you can lift now on an occasional basis?
A:    Maybe about 20 or 30 pounds.
Q:    How long can you stand before you need to change positions?
A:    That's probably about five or ten minutes.
Q:    Would that be because of the problems that you've described with you legs?
A:    Yes.
Q:    Can you stoop?
A:    No.
Q:    Bend?
A:    Bend, yes.
Q:    Twist?
A:    Yes.
Q:    Are there any activities that you've given up that you used to do before April of 2008 that you don't do now?
A:    I don't walk as much as I used to.  I mean before I used to be able to walk four miles a day but I can't do that any more. . . .

_____

[3] Administrative Record at 44.

[4] *Id.* at 59.

Q: Do you sing in the church choir?
A: No.
Q: Why not?
A: I -- it's just too many people.
Q: Do you go to movie theaters?
A: No. Movies -- I don't go to movie theaters. I don't go to restaurants. I don't. The open public just doesn't work for me.

(Administrative Record at 67-68.) Finally, Sadler testified that she lacks energy and sleeps for long periods of time, in part due to her seizure medication.

## 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who:

> has no exertional limitations but should avoid any concentrated exposure to hazards such as moving machinery or height.
>
> She can perform tasks that can be learned in 30 days or less involving no more than simple work-related decisions, few work-based changes, and she should have only brief, superficial interaction with the public, co-workers, and supervisors.

(Administrative Record at 81.) The vocational expert testified that under such limitations, Sadler could not perform her past relevant work, but could perform the following jobs: (1) mail clerk (700 positions in Iowa and 64,000 positions in the nation), (2) cleaner/housekeeping (10,000 positions in Iowa and 890,000 positions in the nation), and (3) janitor (12,000 positions in Iowa and 1,500,000 positions in the nation). Next, the ALJ limited the hypothetical individual to only sedentary work. Again, the vocational expert testified that under such a limitation, Sadler could not perform her past relevant work, but could work at the following sedentary jobs: (1) document preparer (1,300 positions in Iowa and 119,000 positions in the nation), (2) addresser (200 positions in Iowa and 18,000 positions in the nation), and (3) ticket counter (800 positions in Iowa and 72,000 positions in the nation). Lastly, the ALJ inquired whether an individual would be

employable if he or she had the same limitations as the individual in the first hypothetical, except that he or she would be absent from work at least twice per month for several hours at a time. The vocational expert testified that under such limitations, Sadler would be precluded from competitive work.

Sadler's attorney also questioned the vocational expert. Sadler's attorney provided the following hypothetical to the vocational expert:

> [The individual would be l]imited to simple, routine, repetitive, unskilled work. Cannot understand, remember and carry out short and simple instructions on a regular basis. Cannot maintain attention for a two-hour segment. Cannot maintain regular attendance and be punctual.
>
> Would require special supervision. No contact with the public or coworkers. No more than a regular pace, with slow pace a third of the time. Two or more unscheduled breaks. Could only perform work in a routine work setting with no changes. Low stress position only. No close attention to detail or work around hazards. No work in a noisy environment. . . .
>
> As far as exertional restrictions, she could lift 20 pounds to 30 pounds occasionally, stand about 5 to 10 minutes, can sit about a half an hour at a time, walk about 10 to 20 minutes, occasionally stooping, bending, and twisting. And she would be absent from work on an average or she would be incapacitated from work on an average of at least two to three times per month, from 45 minutes to an hour at a time, up to seven hours, or a whole day basically.

(Administrative Record at 83-84.) The vocational expert testified that under such circumstances, Sadler would be precluded from competitive employment.

### C. Sadler's Medical History

On June 5, 2007, Sadler met with Dr. Shekar Raman, M.D., complaining of uncontrolled seizures. Dr. Raman noted that:

> Ms. Sadler is a 33-year-old, female patient, who has a diagnosis of seizures for 17 years now. [She] was initially diagnosed with petit mal seizures at the age of 16. Her

seizures were attacks of staring and mumbling, followed by a
period of confusion. She was managed with antiepileptic
medications for 2 years with good results, became seizure-
free, and was taken off antiepileptic medication. [Sadler] had
a head trauma 2-1/2 years ago, that she thinks precipitated the
recurrence of her seizures, which she got about once every
month. The seizures were again, petit mal seizures, preceded
by nausea and followed by headaches, confusion, and no
paralysis. . . . [Sadler] is going through a very stressful
period and that, she thinks, attributed to an increase in the
frequency of her seizures and a change in their character, as
they are now grand mal seizures. Most recent seizure that she
had was 2 weeks ago, over the weekend, and was witnessed by
[her] cousin. At that time, she was sitting in a recliner and
then lost consciousness, fell to the ground, displayed some
shaking of her whole body and was unresponsive for about 30
minutes.

(Administrative Record at 320.) Dr. Raman admitted Sadler to the hospital for video EEG

monitoring to clarify the type of her seizure disorder. Sadler was monitored over a

three-day period, and recorded a single clinical event. Dr. Mark A. Granner, M.D.,

interpreted the EEG finding, including the "clinical event" and found that "the clinical

features of which coupled with the lack of EEG change indicate a diagnosis of psychogenic

nonepileptic spell (pseudoseizure)."[5] Dr. Granner further noted that "an underlying

epileptic basis for [Sadler's] events was not found."[6]

Sadler returned to Dr. Granner in February 2009, complaining of an increase in

seizure spells from one per month to 3-4 per week. Dr. Granner noted that loud noises,

flashing lights, and stress trigger her seizures. Dr. Granner further noted that Sadler's

seizures are followed by severe headaches that can last for "a couple" of days, and involve

photophobia and nausea. Dr. Ganner diagnosed Sadler with psychogenic nonepileptic

spells and headaches. Dr. Ganner treated Sadler with medication.

_____

[5] Administrative Record at 337.

[6] *Id.*

On June 7, 2010, Dr. Scott Shafer, Ph.D., reviewed Sadler's medical records and provided Disability Determination Services ("DDS") with a psychiatric review technique and mental residual functional capacity ("RFC") assessment for Sadler. On the psychiatric review technique assessment, Dr. Shafer diagnosed Sadler with depressive disorder, PTSD, dissociative disorder, conversion disorder, and history of methamphetamine and alcohol abuse. Dr. Shafer determined that Sadler had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Shafer determined that Sadler was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Dr. Shafer concluded that:

> [Sadler] has a severe mental impairment that does not meet or equal a referenced listing. This is based on the following observations. [Sadler] was able to obtain and perform employment in the past and is currently working as an in-home babysitter. [Sadler] has a history of treatment for her mental condition helping her cope with the multiple traumas she has experienced. [Activities of daily living] indicate [Sadler] can provide care for children and handle her daily responsibilities. [Sadler's] allegations are partially eroded by inconsistencies in record. [She] retains the ability to understand, remember, and follow basic instructions. Her attention, concentration, and pace may vary. She can interact appropriately with the public, co-workers, and supervisors on at least a limited basis. Her judgment is adequate to adjust to changes in the workplace with added support.

(Administrative Record at 450.)

On May 10, 2011, Sadler was referred to Dr. Ralph Scott, Ph.D., for a consultative mental status evaluation. Dr. Scott summarized Sadler's medical history as follows:

> Background information includes five ER treatments[.] . . . These treatments involved headaches, head and back pains, and evidence of seizure activity. Additionally, [Black Hawk-Grundy Mental Health Center] assessments from April 17, 2007 to April 22, 2010 etch the profile of an individual experiencing extensive depression and anxiety. Thus on April 22, 2010[,] Dr. James Harding, treating psychologist, noted that [Sadler] is essentially homebound because of high anxiety unless accompanied with someone. Although noting no evidence of suicidal, homicidal or major medical side effects, Dr. Harding cited increased seizure activity during periods of elevated anxiety and/or depression. Further Dr. S. Raman of UIHC, in summarizing [Sadler's] hospitalization from 6/5/07 to 6/8/07 cited PTSD, panic disorder, intracranial auditory hallucinations, . . . head trauma in approximately 2007, and recurring seizure since approximately 1990.

(Administrative Record at 798.) During his interview with Sadler, Dr. Scott found that she was "[e]asily distracted and experiencing difficulty processing new verbal information[.] . . . Affect was moderately to severely flat and narrow based and judgment of uneven quality but generally fair."[7] Dr. Scott also found that Sadler's short term and remote memory functioning was "clearly below age norms and she required periodic repetition of even relatively rudimentary information."[8] In discussing her mental health symptoms, Sadler reported:

> a long history of auditory distractions; periodically 'voices' which sound like a former abusive boyfriend disparage her and encourage physical harm to self but not to others. Additionally, [Sadler] cited racing thoughts and chronic difficulty focusing and sustaining attention. She also claimed

---

[7] Administrative Record at 798.

[8] *Id.*

> frequent depression marked by a desire to 'hide' and self
> isolate; frequently she prefers to stay in bed.

(Administrative Record at 798-99.) Upon examination and testing, Dr. Scott diagnosed Sadler with generalized anxiety disorder, major depression disorder, personality change due to traumatic brain injury, psychotic disorder, history of polysubstance abuse in full remission, headaches, ongoing long-term seizure history, and obesity. Dr. Scott concluded that:

> Results of this evaluation support other historic evidence that
> [Sadler] contends with long term and chronically significant
> anxiety and depression. The overall pattern of severe
> emotional vulnerability indicates that [Sadler] is highly
> unlikely to gain vocational success beyond the requirements of
> her current part time and low-skill position where she is
> apparently provided extensive accommodations.

(Administrative Record at 800.)

On July 28, 2011, at the request of Sadler's attorney, Dr. James Harding, Ph.D., Sadler's treating psychologist, filled out a "Mental Impairment Questionnaire" for Sadler. Dr. Harding diagnosed Sadler with PTSD, depressive disorder, dissociative disorder, physical abuse as a child, physical and sexual abuse as an adult, past history of addictive personality, conversion disorder, psychogenic seizures, history of alcohol and methamphetamine abuse, and personality disorder. Dr. Harding noted that Sadler's treatment and response to treatment is worse when she is in an abusive relationship. When in a safe environment, however, Sadler has fewer seizures, no overdoses, and fewer trips to the emergency room. Dr. Harding's prognosis for Sadler was "very guarded as to improvement[.]"[9] Dr. Harding addressed Sadler's functional limitations and found that she was unable to meet competitive standards in: understanding and remembering very short and simple instructions, maintaining attention for two hour segments, maintaining regular attendance and being punctual within customary, usually strict tolerances,

---

[9] Administrative Record at 803.

sustaining an ordinary routine without special supervision, working in coordination with or in proximity to others without being distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, dealing with normal work stress, interacting appropriately with the general public, maintaining socially appropriate behavior, and traveling in an unfamiliar place. Dr. Harding also opined that Sadler had no useful ability to function in understanding and remembering detailed instructions, carrying out detailed instructions, and dealing with stress of semi-skilled and skilled work. Dr. Harding also noted that flashbacks and increased anxiety cause Sadler to suffer from headaches and conversion seizures. Dr. Harding determined that Sadler had the following limitations: moderate restriction of activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. Dr. Harding also opined that Sadler's anxiety disorder caused her a complete inability to function independently outside the area of her home. Lastly, Dr. Harding opined that Sadler would be absent more than four days per month due to her impairments and treatment for her impairments.[10]

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Sadler is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*,

---

[10] Dr. Harding filled out another "Mental Impairment Questionnaire" on January 4, 2012. His answers on the 2012 questionnaire were nearly identical to the answers on the 2011 questionnaire. *Compare* Administrative Record at 803-809 (2011 questionnaire) with 1249-1254 (2012 questionnaire).

482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*,

524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Sadler had not engaged in substantial gainful activity since April 16, 2008. At the second step, the ALJ concluded from the medical evidence that Sadler had the following severe impairments: psychogenic seizures, conversion disorder, migraines, major depressive disorder, PTSD, and a history of substance abuse. At the third step, the ALJ found that Sadler did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Sadler's RFC as follows:

> [Sadler] has the residual functional capacity to perform a range of work at all exertional levels. Specifically, [Sadler] is able to perform work that does not require concentrated exposure to hazards such as moving machinery or heights. She is able to perform tasks that can be learned in thirty days or less, involving no more than simple work related decisions and few work place changes. [She] is able to sustain only brief, superficial interaction with the public, co-workers, and supervisors.

(Administrative Record at 15.) Also at the fourth step, the ALJ determined that Sadler was unable to perform any of her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Sadler could work

at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Sadler was not disabled.

## B. *Objections Raised By Claimant*

Sadler argues that the ALJ erred in four respects. First, Sadler argues that the ALJ failed to properly evaluate the opinions of Dr. Harding, her long-time treating psychologist. Second, Sadler argues that the ALJ failed to properly evaluate the opinions of Dr. Scott, a consultative examining psychologist. Third, Sadler asserts that the ALJ's RFC assessment is flawed because he failed to consider the effects of her various impairments on her ability to perform work without an unreasonable number of absences. Lastly, Sadler argues that the ALJ failed to properly evaluate her subjective allegations of disability.

### 1. *Dr. Harding's Opinions*

Sadler argues that the ALJ failed to properly evaluate the opinions of her long-time treating psychologist, Dr. Harding. Specifically, Sadler argues that the ALJ's reasons for discounting Dr. Harding's opinions are not supported by substantial evidence in the record. Sadler maintains that this matter should be remanded to allow the ALJ to properly consider Dr. Harding's opinions.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

In his decision, the ALJ addressed the opinions of Dr. Harding as follows:

> Here, the opinions of Dr. Harding are not entitled to controlling weight. The opinions are not consistent with other substantial evidence, including the opinions of the state agency consultants. Considering the applicable factors, [Sadler] has a longstanding treatment relationship with Dr. Harding and is treated by Dr. Haring [(*sic*)] at least monthly. Dr. Harding's specialty is mental health treatment, but the factors of supportability and consistency weigh heavily against adoption of the opinion. While Dr. Harding routinely assigned [Sadler]

low GAF scores, the records from Dr. Harding do not provide a basis for GAF score fluctuation. Dr. Harding does not recommend treatment changes despite his opinion that [Sadler] is functioning so poorly. The opinion is not consistent with the records from other providers at the same facility. It is also not consistent with the reports that [Sadler] has responded well to therapy, and has intact mental status examinations without noted difficulties.

[Sadler] is also treated regularly by Cyd Q. Grafft, ARNP, for medication management. [Sadler's] medication management records consistently reflect higher scores, and perhaps more significantly, when the two providers have co-signed [her] diagnosis sheet, [her] GAF score is consistently 55, reflecting only moderate symptoms. The undersigned has considered the opinion of Dr. Harding under the applicable factors, but the opinion is entitled to little weight.

(Administrative Record at 19.) ) Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Harding. The Court also finds that the ALJ provided "good reasons" for rejecting Dr. Harding's opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. *Dr. Scott's Opinions*

Sadler argues that the ALJ failed to properly evaluate the opinions of Dr. Scott, a consultative examining psychologist. Specifically, Sadler argues that the ALJ's reasons for discounting Dr. Scott's opinions are not supported by substantial evidence in the record. Sadler maintains that this matter should be remanded to allow the ALJ to fully and fairly develop the record with regard to the opinions of Dr. Scott.

An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the

non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese v. Astrue*, 552 F.3d 728, 731 (8th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Furthermore, an ALJ also has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

In his decision, the ALJ thoroughly addressed Dr. Scott's opinions as follows:

> Ralph Scott, Ph.D., a licensed psychologist, examined [Sadler] at the request of [Sadler's] attorney. Based on the one-time evaluation and a review of available medical records, Dr. Scott opined that [Sadler] was unlikely to gain vocational success beyond the requirements of her current part-time work with extensive accommodations. Dr. Scott does not provide specific functional limitations, but instead draws a vocational conclusion.
>
> The undersigned obtained evidence from a vocational expert regarding the impact of [Sadler's] functional limitations on the

available job base. The vocational expert cited occupations that could be performed despite the limitations in [Sadler's] residual functional capacity. Further, the statment from Dr. Scott attempts to resolve an issue reserved to the commissioner. For these reasons, the opinion of Dr. Scott is given little weight.

Dr. Scott's examination is carefully reviewed, however, to determine a clinical basis for his vocational opinion. At that appointment, [Sadler] demonstrated some difficulty reading (somewhat inconsistent with her attending University of Iowa), and with short-term and remote memory 'below age norms.' She was oriented but alleged periodic auditory hallucinations. Interestingly, however, at her examinations by treating sources she denied any hallucinations, other than some vague episodes[.] (Exhibits 32F; 36F) Further, she denied any ongoing substance abuse (Exhibit 27 page 4), although to her treating sources she admits to ongoing marijuana use. (Exhibit 32F) These factors suggest that Dr. Scott's conclusions were influenced by insufficient data.

(Administrative Record at 19-20.) Having reviewed the entire record, the Court finds that the ALJ properly considered Dr. Scott's opinions and addressed them in his decision. *See Wagner*, 499 F.3d at 848. Moreover, the Court finds that the ALJ properly weighed the opinions of Dr. Scott and explained his reasoning for granting Dr. Scott's opinions "little weight." *See Wiese*, 552 F.3d at 731. Therefore, the Court concludes that the ALJ fully and fairly developed the record with regard to the opinions of Dr. Scott. *See Cox*, 495 F.3d at 618. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3. *RFC Assessment*

Sadler argues that the ALJ's RFC assessment is flawed and not supported by substantial evidence. Specifically, Sadler argues that when making his RFC assessment, the ALJ erred because he failed to take into consideration her need for absences from work

due to her impairments. Sadler concludes that this matter should be remanded for further consideration of her RFC.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

While the ALJ does not specifically address the effects of Sadler's various impairments on her ability to perform work without an unreasonable number of absences, the ALJ's decision demonstrates a thorough consideration of the record as whole, including the effects of Sadler's impairments on her ability to find competitive employment.[11] Therefore, having reviewed the entire record, the Court finds that the ALJ properly considered Sadler's medical records, observations of treating physicians, and Sadler's own description of her limitations in making his RFC assessment for Sadler.[12] *See Lacroix*,

---

[11] *See* Administrative Record at 13-21 (providing discussions of Sadler's impairments, mental health, functional abilities, medical history, and vocational evidence).

[12] *Id.* at 15-20 (providing thorough discussion of the relevant evidence for making
(continued...)

465 F.3d at 887. Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007) (providing that an ALJ also has a duty to develop the record fully and fairly). Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. The Court concludes that Sadler's assertion that the ALJ's RFC assessment is flawed and not supported by substantial evidence is without merit.

### 4.    *Credibility Determination*

Sadler argues that the ALJ failed to properly evaluate her subjective allegations of disability. Sadler maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Sadler's testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical

_____

[12](...continued)
a proper RFC determination).

evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

In his decision, the ALJ determined that:

> After careful consideration of the evidence, the undersigned finds that [Sadler's] medically determinable impairments could

24

reasonably be expected to cause some of the alleged symptoms; however, [Sadler's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The degree of limitation alleged by [Sadler] is not supported by objective evidence, examination findings, or treatment notes. [Sadler] alleges limitations from frequent seizures and migraines. Although [her] records document regular emergency room treatment for reported seizures and migraines, this treatment is not of a frequency or severity to support a finding of disability. [Sadler] has many unremarkable CT scans. However, some reveal white matter. Her MRI confirmed the presence of white matter, often associated with migraines. [Sadler's] EEGs are normal and her treatment providers attribute her reports of seizures to psychogenic seizures. The undersigned finds that as a precaution, [Sadler] must avoid concentrated exposure to hazards such as moving machinery or heights. Also, [Sadler's] migraines are consistent with a limitation to no more than simple work related decisions due to potential distraction.

As to [Sadler's] allegations of limitations from mental or psychiatric impairments, the evidence does not support the degree of limitation alleged. In making this determination, the undersigned considered [Sadler's] treatment notes. [Sadler] has a long history of treatment. Her individual therapy treatment notes often reflect low global assessment of functioning (GAF) scores ranging from 48 to 50. However, her medication appointments reflect stable GAFs of 55. In resolving this apparent conflict, the undersigned has considered the diagnosis records, signed by both treatment providers. When both providers sign an evaluation, [Sadler's] GAF is consistently 55. Also, the lower scores in the individual therapy records do not appear to correlate with worsening. . . . Further, [Sadler's] treatment provider does not recommend changes to [her] treatment despite the low GAF scores. There are also some inconsistencies in [Sadler's] reports. For example, [her] individual therapy notes suggest she is homebound most of the time, but a medication

management note from the same month included a report from [Sadler] of trying to go to karaoke. Considering these factors, the undersigned gives more weight to the assessments at [Sadler's] medication appointments, reflecting moderate symptoms. . . .

Thus, [Sadler's] objective evidence, examination findings, and treatment notes establish impairments more than minimally affecting [her] ability to perform basic work-related activities, but do not document a level of severity consistent with [her] allegations of disability.

The undersigned has considered [Sadler's] activities. [She] described living fairly independently with an ability to perform household chores, prepare meals, and manage personal care activities. Although [she] does not drive, she is able to utilize public transportation and obtain rides from friends. While [Sadler] testified to difficulty being around other people, her treatment records nonetheless reflect reports of activities that would suggest a greater ability than [she] alleges. For example, [Sadler] reported performing karaoke. On another occasion, [she] reported attending a noisy hockey game. The undersigned allows that these may not be regular daily or weekly activities, but these activities even on a limited basis suggest [Sadler] is not as limited as alleged. . . .

In evaluating [Sadler's] credibility, the undersigned has considered [her] medications and other treatment methods employed by [Sadler]. At her hearing[, she] testified she receives some benefit from anxiety medication. [She] explained the medication does not completely eliminate her anxiety, but allows her to function. This improvement with medication is consistent with [her] ability to shop and interact with friends on a regular basis, and on occasion, engage in other activities such as karaoke and hockey games. The undersigned has considered this factor, but does not find that it bolsters the credibility of [Sadler's] allegations.

(Administrative Record at 16-18.)

It is clear from the ALJ's decision that he thoroughly considered and discussed Sadler's treatment history, medical history, functional restrictions, medication use, and activities of daily living in making his credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Sadler's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Sadler's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## VI. CONCLUSION

The Court finds that the ALJ properly considered and addressed the medical evidence and opinions in the record, including the opinions of Dr. Harding and Dr. Scott. The Court also finds that the ALJ properly considered the medical evidence as a whole, and made a proper RFC determination based on a fully and fairly developed record. Lastly, the Court finds that the ALJ properly determined Sadler's credibility with regard to her subjective allegations of disability. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1.      The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.    Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and

3.    The Clerk of Court is directed to enter judgment accordingly.

DATED this $\underline{18^{th}}$ day of October, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA